UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 10/29/19

---

MARIA HIDALGO AND ABUNDIO
SANCHEZ, *individually and as parents and
natural guardians of L.S.*,

                              Plaintiffs,

              v.

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                              Defendant.

No. 19-CV-2590 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiffs Maria Hidalgo and Abundio Sanchez are the parents of a 10-year old child, L.S., who suffers from a traumatic brain injury. They commenced this action against the New York City Department of Education (the "DOE"), seeking funding for L.S.'s enrollment at the International Institute for the Brain ("iBrain"), a private school for students with special needs. Before the Court is Plaintiffs' motion for a preliminary injunction requiring the DOE to pay for L.S.'s tuition at iBrain for the 2018–2019 school year, until a final adjudication on their underlying administrative action against the DOE is rendered, pursuant to the so-called "stay-put" or "pendency" provision of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(j).[1] For the following the reasons, the motion is DENIED.

---

[1] At oral argument held on August 8, 2019, the parties were asked to inform the Court once a decision on the administrative action had been made. As the parties have not done so, the Court assumes for the purposes of this opinion that the decision remains pending.

## BACKGROUND

### I. Statutory Background

Pursuant to the IDEA, federal funds are "available to assist state and local agencies" in educating disabled children, "provided that the recipients of those funds comply with various provisions of the Act." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 448 (2d Cir. 2015). One such provision requires that the resident school district offer the disabled child a "free appropriate public education" ("FAPE"). 20 U.S.C. § 1400(d)(1)(A). To achieve that end, "school districts must create individualized education programs ('IEPS')" for disabled children. *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 72 (2d Cir. 2014). An IEP "is a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (internal citations omitted). In New York, Committees on Special Education ("CSEs") convened by the local school district are responsible for developing IEPs. *See* N.Y. Educ. Law § 4402(1)(b)(1).

If parents believe that their child has been denied a FAPE because, for example, the CSE's IEP does not comply with the IDEA, they may file a due process complaint with the appropriate state agency. *See* 20 U.S.C. § 1415(b)(6). They may then challenge the IEP in an "impartial due process hearing," *id.* § 1415(f)(1)(A), which, in New York, first occurs before an independent hearing officer ("IHO") appointed by the local board of education, *see* N.Y. Educ. Law § 4404(1). Either the DOE or the parents may subsequently challenge the IHO's decision to the Office of State Review, where it will be reviewed by another officer ("SRO"). *See id.* § 4404(2); *see also* 20 U.S.C. § 1415(g). The SRO's decision may then be challenged in state or federal court. *See id.* §

2

1415(i)(2)(A).

Pertinent to this case, the so-called "stay-put" or "pendency" provision of the IDEA further provides that, during the pendency of due process review hearings, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . ." 20 U.S.C. § 1415(j). "A claim for tuition reimbursement pursuant to the stay-put provision is evaluated independently from the evaluation of a claim for tuition reimbursement pursuant to the inadequacy of an IEP." *Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 386 F.3d 158, 160 (2d Cir. 2004). "Section 1415(j) represents Congress' policy choice that all handicapped children, *regardless of whether their case is meritorious or not,* are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." *Id.* at 160-61. Put more simply, § 1415(j) mandates that an educational agency maintain the "then-current educational placement even if the child would have no substantive right to it." *E. Lyme Bd. Of Educ.*, 790 F.3d at 453. This is because "[t]he purpose of the pendency provision is to provide stability and consistency in the education of a student with a disability," *Arlington Cent. Sch. Dist. v. L.P.*, 421 F. Supp. 2d 692, 696 (S.D.N.Y. 2006), and to "maintain the educational status quo while the parties' dispute is being resolved," *E. Lyme Bd. of Educ.*, 790 F.3d at 452 (quoting *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014)).

## II. Factual Background[2]

Plaintiffs are the parents of L.S., a 10-year-old child. Due to a traumatic brain injury, L.S. has global developmental impairments that render her non-verbal and non-ambulatory. As a student classified as having a disability, the New York City Department of Education ("DOE")

---

[2] Unless otherwise noted, the facts in this section are drawn from Plaintiffs' Complaint and are undisputed.

must provide her with a FAPE for every school year.

On March 24, 2016, the CSE convened an IEP meeting for L.S.  According to Plaintiffs, they agreed with the DOE at the meeting that L.S.'s IEP for the 2016–2017 school year should include an educational program consisting of, among other things, a 6:1:1 class size (i.e., 6 students, 1 teacher, and 1 aide).  Although the IEP was not reduced to writing at the meeting, the meeting was audio recorded, and Plaintiffs submitted a copy of the recording in support of the instant motion.

On June 23, 2016, Plaintiffs sent the DOE a so-called "10-Day Notice" indicating their intent to "unilaterally place their daughter at The International Academy of Hope ("iHope") for the 2016–2017 school year."  Their reason for doing so was their purported "understanding that there is no private school placement the DOE can recommend which would be appropriate for L.S." Ashanti Decl., Ex. C (Dkt. 21-3).[3]

The following day, the DOE issued a written version of what it claimed was the IEP agreed upon by the parties at the March 24, 2016 meeting. *See* Ashanti Decl., Ex. B (Dkt. 21-2). Plaintiffs contend that the document "matches up very consistently" with the terms of the IEP discussed at the meeting, except—critically—that this June 24, 2016 document provides for a class ratio of 12:1:4, not 6:1:1. Pls' Mem. at 5 (Dkt. 22). As such, they maintain that the June 24, 2016 document reflects an inaccurate memorialization of the IEP that they allegedly agreed to at the March 24th meeting.

Despite the discrepancy between the terms allegedly reached at the March 24th IEP meeting

---

[3] The record reflects that L.S. also attended iHope during the prior 2015–2016 school year, which the DOE funded as parted of a stipulation of settlement.  See 10-Day Notice, Ashanti Decl., Ex. C (stating that "[s]ince the DOE settled this case last year (the 2015–2016 academic year) by providing prospective payment of tuition at iHope," Plaintiffs were thus requesting "a similar settlement for the upcoming school year"); Aug. 9, 2018 Hr'g Tr. (Dkt. 21-8) at 10:1 (noting that "the student was unilaterally placed at iHope" in July 2015 after a CSE meeting in April 2015 which had recommended a public school).

and the June 24th IEP document, in 2017 the parties entered into a stipulation of settlement in which the DOE agreed to fund L.S.'s placement at iHope for the 2016–2017 school year. The stipulation provided that it could be renewed "for up to two school years," (i.e., the 2017–2018 and 2018–2019 school years) under certain conditions not relevant here (the "settlement agreements"). It also provided that it could not be relied upon by any party "to indicate, establish, or support the position that the School and/or Services provided and/or funded . . . comprises in whole or in part, the Student's educational program for purposes of the 'pendency' or 'stay put' provisions of the [IDEA]." Ashanti Decl., Ex. D.

L.S. attended iHope during the 2016–2017 and 2017–2018 school years pursuant to the Stipulation Agreements. On June 21, 2018, however, Plaintiffs provided the DOE with a 10-Day Notice indicating that L.S. was being unilaterally placed at iBrain for the 2018–2019 school year. Ashanti Decl., Ex. E. On July 9, 2018, L.S. started attending iBrain, where she remains a student. On that same day, Plaintiffs filed a due process complaint against the DOE, alleging that it did not provide L.S. with a FAPE for the 2018–2019 school year, and requesting, among other things, a "stay put" or pendency order requiring the DOE to fund L.S.'s placement at iBrain during the course of the due process proceedings.

IHO Ajello heard evidence regarding L.S.'s pendency placement on August 30, 2018.[4] Ten days later, the IHO issued an order ruling that L.S.'s pendency should be based on an April 29, 2015 IEP—the IEP for the 2015–2016 school year—which recommended, in part, a 12:1:4, and not a 6:1:1, class size for L.S. Plaintiffs appealed the IHO's pendency order to SRO Carol Hague. On November 23, 2018, the SRO largely affirmed the IHO's order, except that she found that L.S.'s pendency placement should be based on an even earlier IEP—one established for the 2014–

---

[4] The parties previously appeared for an August 9, 2018 pendency hearing before IHO Murphy, who recused herself from the case at the conclusion of the hearing.

2015 school year.

Plaintiffs filed suit in this Court on March 22, 2019. Just over three months later, they moved for a preliminary injunction seeking the same relief as that in the Complaint—namely an order vacating the SRO's decision, and directing the DOE to fund L.S.'s placement at iBrain until after Plaintiffs' due process proceeding has been finally adjudicated. Oral argument on the motion was held on August 8, 2019, at which time the parties were granted permission to submit supplemental letters addressing the impact on this case of recent decisions in this district including *Neske v. N.Y.C. Dep't of Educ.*, No. 19-CV-2933 (VEC), 2019 WL 3531959, at *6 (S.D.N.Y. Aug. 2, 2019), and *Soria v. N.Y.C. Dep't of Educ.*, No. 19-CV-2149 (AT), 2019 WL 3715057 (S.D.N.Y. Aug. 7, 2019), *appeal filed*, No. 19-2540 (2d Cir. Aug. 16, 2019).

## LEGAL STANDARDS

When a plaintiff successfully establishes a right to pendency pursuant to 20 U.S.C. § 1415(j), that right is enforced by way of an "automatic preliminary injunction," "without regard to such factors as irreparable harm, likelihood of success on the merits, and balancing of the hardships." *Abrams v. Carranza*, No. 19-CV-4175 (AJN), 2019 WL 2385561, at *3 (S.D.N.Y. June 6, 2019) (citing *Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982)). In other words, in determining whether a plaintiff is entitled to the pendency placement he or she is seeking, the Court must simply ascertain the child's "then-current educational placement." 20 U.S.C. § 1415(j); *see also M.G. v. N.Y.C. Dep't of Educ.*, 982 F. Supp. 2d 240, 247 (S.D.N.Y. Aug. 1, 2013).

"[D]istrict courts must accord deference to state administrative agencies when reviewing their IDEA decisions." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 838 (2d Cir. 2014). At the same time, "[a] court accords no particular deference to an SRO on pure questions of law."

*Arlington Cent. Sch. Dist.*, 421 F. Supp. 2d at 695.  Because, in the pendency context, "the meaning of 'then-current' and 'placement' . . . are pure questions of law," the SRO is not entitled to deference on this issue.  *L.L. v. N.Y.C. Dep't of Educ.*, No. 15-CV-4146 (JPO), 2016 WL 4535037, at *7 n.4 (S.D.N.Y. Aug. 30, 2016).

## DISCUSSION

### I. The Pendency Provision

As previously noted, pursuant to 20 U.S.C. § 1415(j), L.S. "shall remain in [her] then-current educational placement," while her due process complaint alleging that the DOE failed to provide her with a FAPE for the 2018–2019 school year is pending. Generally, the "then-current educational placement" is that which "was last agreed upon for the child." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 171 (2d Cir. 2014). To determine that "educational placement" courts typically look to: "(1) 'the placement described in the child's most recently implemented IEP'; (2) 'the operative placement actually functioning at the time when the stay put provision of the IDEA was invoked'; or (3) 'the placement at the time of the previously implemented IEP.'" *E. Lyme Bd. of Educ.*, 790 F.3d at 452 (quoting *Mackey*, 386 F.3d at 163).

These three definitions turn on the meaning of "placement" in § 1415(j). The Second Circuit first defined the phrase "educational placement," as it was used in other provisions of the IDEA, to refer "only to the general type of educational program in which the child is placed," *Concerned Parents & Citizens for the Continuing Educ. at Malcolm X (PS 79) v. N.Y.C. Bd. of Educ.*, 629 F.2d 751, 753 (2d Cir. 1980), that is, "the classes, individualized attention and additional services a child will receive—rather than the 'bricks and mortar' of the specific school." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009). In *T.M. ex. Rel. A.M. v. Cornwall Central School District*, the Circuit specifically applied that definition in the context of § 1415(j),

7

interpreting the phrase "educational placement" in § 1415(j) to refer to "the same general level and type of services" a disabled child receives. 752 F.3d at 171.

## II. Pendency Cannot Be Based on a Substantial Similarity Theory in this Case

Plaintiffs assert that L.S.'s pendency placement is at iBrain, because the program at iBrain is "substantially similar" to the one described in—what Plaintiffs purport to be—L.S.'s most recently implemented IEP.[5] According to Plaintiffs, under the foregoing Second Circuit precedent, when a school district provides funding for a private school, parents may move their child to another private school, and receive "stay-put" funding for the new placement—so long as the new school offers a program substantially similar to the prior one.  Several courts in this district have agreed. *See Melendez v. N.Y.C. Dep't of Educ.*, No. 19-CV-2928, 2019 WL 5212233, at *9 (S.D.N.Y. Oct. 16, 2019) (remanding to the IHO "to determine to what extent the services J.C. received at iBrain are substantially similar to those he received at iHope"); *Navarro Carrilo v. N.Y.C. Dep't of Educ.*, 384 F. Supp. 3d 441, 446–448 (S.D.N.Y. 2019) (applying *Concerned Parents*, *T.M.*, and *T.Y.* to hold, contrary to the IHO's decision, the plaintiffs were entitled to stay-put funding at iBrain, after they unilaterally moved their child there from iHope, so long as the two schools' educational programs were "substantially similar"), *appeal filed*, No. 19-1813 (2d Cir. June 19, 2019); *Soria*, 2019 WL 3715057, at *3–4 (same, citing *Navarro*, except in reviewing decision of SRO, rather than IHO); *Abrams*, 2019 WL 2385561, at *4 (same, except in affirming decision of IHO).

The DOE responds by asserting that Plaintiffs' substantial similarity theory, as applied here, would set an untenable precedent. In its view, permitting Plaintiffs to unilaterally transfer L.S. to iBrain on such a theory would effectively allow parents to use the pendency provision to

---

[5] The parties' disagreement over which IEP was the most recently implemented is addressed in the next section of this Opinion.

ensure that the DOE always pays for the parents' choice of school for their child—regardless of whether the DOE is able to provide the child with a FAPE somewhere else. The court in *Neske* recently endorsed this argument in holding that § 1415(j) does not require the DOE to fund a child's attendance at a "substantially similar" school when the existing school can service the student's IEP. *See Neske*, 2019 WL 3531959, at *7-8; *see also de Paulino v. N.Y.C. Dep't of Educ.*, 2019 WL 2498206, at *3 (S.D.N.Y. May 31, 2019) (concluding that plaintiff was not entitled to unilaterally move her child from the child's "proper pendency placement" to a preferred "substantially similar" placement).

This Court finds the reasoning in *Neske* persuasive. As the *Neske* court explained, Second Circuit precedent interpreting the meaning of "educational placement" has done so in the context of examining the school district's ability to choose the specific school to service a child's IEP. *Concerned Parents* held that the school district's decision to transfer children in special classes at one school "to substantially similar classes at other schools within the same school district," did not constitute a change in "educational placement" triggering the notice requirement under § 1415(b).[6] 629 F.2d at 756. If it did, the court reasoned, it would "virtually cripple the Board's ability to implement even minor discretionary changes within the educational programs provided for its students." *Id.* at 755. Likewise, *T.Y.* held that the IDEA only requires that a school district place a student in a school that can provide the student with a FAPE, as opposed to any "specific school location." 584 F.3d at 420 (concluding that "an IEP's failure to identify a specific school location will not constitute a *per se* procedural violation of the IDEA"). And *T.M.* (which the *Neske* court did not address) similarly held that the plaintiffs were not entitled to "stay-put" funding at a private school in which they had placed their child, once the district "offer[ed] to provide the

---

[6] At the time, 20 U.S.C. § 1415(b) mandated that agencies provide prior written notice to parents before "refus[ing] to initiate or change the . . . educational placement of the child."

required pendency services" at another school. 752 F.3d at 171.

The animating principle behind these three decisions is the same: the IDEA does not constrain a *school district's* ability to choose the specific school to service a child's IEP, provided that the chosen school can do so adequately. Accordingly, "[t]he IDEA's pendency provision does not entitle a disabled child to keep receiving services from the exact same service providers while his proceedings are pending." *Id.* Rather, "[i]t is up to the school district to decide how to provide that educational program, at least as long as the decision is made in good faith." *Id.*

Plaintiffs seek to extend this Circuit's law so that parents may be endowed with the same flexibility as the school district to decide the specific school to be served by an IEP. In their view, this result is compelled by the fact that the Circuit has interpreted the phrase "educational placement" to refer "only to the general type of educational program in which the child is placed." *Concerned Parents*, 629 F.2d at 753. But as *Neske* recognized, the Court of Appeals did so "only to conclude that the IDEA does not require the school district to assign the student to any 'specific school location,' as long as the assigned school meets the child's needs." 2019 WL 3531959, at *6 (quoting *T.Y.*, 584 F.3d at 42). In this Court's view, *Concerned Parents*, *T.Y.*, and *T.M.* cannot reasonably be read to support the conclusion that the interpretation of "educational placement" in those cases applies with equal force when *parents* seek to place their child at a specific school and demand that the DOE pay for it. Granting parents such flexibility would effectively undermine the school district's ability to choose the appropriate schools for the children in its district, as they are authorized to do under the IDEA. Indeed, to extend the interpretation of the phrase "educational placement" from the context in which it was presented, as Plaintiffs urge here, would lead to the very result that the Circuit's precedent appears intended to prevent: it would constrain the ability of "the school district to decide how to provide that educational program"—including choosing

10

school locations—so long as the children still receive a FAPE. *T.M.*, 752 F.3d at 171.

Moreover, adopting Plaintiffs' theory could undermine the existing statutory scheme. In many situations, it would allow parents to move their child to a new school of their choice, file a due process complaint alleging that the DOE did not provide their child with a FAPE for that school year, and then obtain stay-put funding accordingly. Even if it turns out that the DOE had provided a FAPE for that school year all along (i.e., the parents' due process challenge is unsuccessful), the parents would not need to reimburse the DOE for the stay-put funding it received for the prior year. This is because § 1415(j) entitles parents to stay-put funding regardless of whether their underlying FAPE claim is meritorious or not. *See Mackey*, 386 F.3d at 160-61; *C.G. ex rel. B.G. v. N.Y.C. Dep't of Educ.*, 752 F. Supp. 2d 355, 361 (S.D.N.Y. 2010) (explaining that "[a]llowing the DOE to seek reimbursement of pendency payments . . . goes against the vast weight of binding and non-binding case law") (citing cases)). As noted by Judge Caproni, extending Second Circuit precedent in the manner urged by Plaintiffs thus provides a way for parents to "compel the [DOE] to pay for whatever new school they choose." *Neske*, 2019 WL 3531959, at *6 (characterizing the same theory asserted by plaintiffs here as an effort "to divorce the term 'placement' from any particular brick-and-mortar school" when the parents seek to move their child from one school to another "and then graft a school-specific requirement back onto the definition once [the child] has been enrolled in the school of their choice" so that the DOE will pay for it).

Finally, as the *Neske* court recognized, providing parents with unfettered discretion to choose the specific school to service an IEP—where more than one effectively can—runs counter to the underlying policies of the stay-put provision. If the ability to select a child's school could "be wielded concurrently by the school district and the parents," this may lead to an "endless tug-

of-war" in which children are repeatedly transferred from one school to another. *Id.* at *7. This scenario "risks undermining the very purpose of Section 1415(j), which is to ensure stability for the student." *Id.* Provided that the school the child was already attending, and the DOE was funding, remains available to service the child's IEP, § 1415(j) does not grant parents the authority to unilaterally move their children to a substantially similar school and compel the DOE to pay for it.

For the foregoing reasons, the Court rejects Plaintiffs' attempt to establish L.S.'s pendency placement at iBrain on the basis that it is substantially similar to her prior placement.

## III. The Most Recently Implemented IEP

The SRO decided L.S.'s pendency based on the placement recommended in what she found to be L.S.'s most recently implemented IEP—an IEP from the 2014–2015 school year. Plaintiffs argue that this finding was in error. According to them, L.S.'s most recently implemented IEP consists of the terms that the parties allegedly agreed to at the March 24, 2016 CSE meeting. Plaintiffs claim that the terms agreed upon at that meeting were implemented at iHope for the 2016–2017 school year, and that the meeting—or the recording of the meeting—therefore constitutes the last implemented IEP. The Court disagrees.

Neither party addresses how the IDEA defines an IEP, but § 1401 clearly provides that it is a "*written statement* for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d)." Section 1414(d) reiterates that an IEP is a "written statement" and further provides the various "statements" that an IEP must include, such as those addressing the "child's present levels of academic achievement and functional performance," "measurable annual goals," and "the special education and related services and supplementary aids and services." § 1414(d)(1)(A)(i). Section 1414(d)(3) further provides that "[c]hanges to the IEP" must

be made by "develop[ing] a written document to amend or modify the child's current IEP." A finding that an IEP can exist in the form of a verbal agreement appears contrary to the statutory provisions defining it.

It is true that, as the SRO recognized, the written IEP that issued on June 24, 2016 is inconsistent in part with the audio recording of the March 24, 2016 meeting. On one page, the June 24th written IEP correctly noted that the parents had rejected a 12:4:1 class size because L.S. "presents with highly intensive management needs that require a smaller class setting with additional adult support." Ashanti Decl., Ex. B at 22 (Dkt. 21-2). Moreover, the audio recording reflects, as the SRO recognized, that the parties agreed that a 6:1:1 special class was appropriate for L.S. and would be recommended in her IEP for the 2016–2017 school year. Ashanti Decl., Ex. A, at 2:50:00–2:56:00. Nonetheless, the written IEP recommends a 12:4:1 class size for L.S. *Id.* at 18. Despite these discrepancies, Plaintiffs did not seek to amend the written document, seemingly because the DOE ultimately agreed to pay L.S.'s tuition at iHope for the 2016–2017 school year, pursuant to the settlement agreements. As Plaintiffs conceded in their August 16, 2019 letter, however, the audio recording of the meeting "does not, by itself, demonstrate that the parties agreed to a non-public school for L.S." Pl.'s Aug. 16, 2019 Ltr. at 3. Nor have Plaintiffs identified any precedent in which a Court has deemed a verbal agreement to constitute an IEP. Accordingly, even accepting Plaintiffs' account of what the parties verbally agreed to at the March 24, 2016 meeting, it cannot constitute L.S.'s last implemented IEP. Plaintiffs' request that the SRO's order be vacated to the extent it declined to rule that the IHO erred in not considering the audio recording is thus denied.[7]

---

[7] It follows that Plaintiffs' argument that the SRO erred in declining to remand to the IHO for a determination as to whether the June 23, 2016 10-day notice was a rejection of the purported IEP created at the March 24, 2016 meeting fails, because the meeting never constituted an IEP to begin with.

13

Relatedly, the Court declines to disturb the SRO's finding that the IEP last implemented by the parties was the one created for the April 2014–2015 school year. The SRO determined that the IHO had erred in finding that the placement recommended by the April 2015 IEP (for the 2015–2016 school year) was the last agreed upon placement for L.S. This was because that IEP had recommended placement in a district specialized school, whereas L.S. attended a nonpublic school for the 2015–2016 school year. As the parties did not contest that L.S. attended a nonpublic school during the 2014–2015 school year in an agreed-upon program, the SRO found that the 2014–2015 IEP was the last one implemented by the parties. Her reasoning in support of that finding is sufficiently supported by the record and Plaintiffs' arguments to the contrary are rejected.

**IV. Operative Placement**

In deciding L.S.'s pendency placement, the SRO also relied upon the operative placement factor, concluding that L.S.'s "operative placement at the time the due process complaint was filed was the program actually provided to the student at an approved nonpublic school during the 2014–2015 school year." The Court concludes otherwise.

"Courts tend to rely on the 'operative placement' factor"—which, as noted, looks to the child's placement at the time the due process complaint is filed—"in circumstances in which there was no prior-implemented IEP that might guide a determination of a 'current educational placement.'" *Navarro*, 384 F. Supp. 3d at 464; *see also Pardini v. Allegheny Intermediate Unit*, 420 F.3d 181, 190 (3d Cir. 2005) (explaining that, in instances where no prior IEP has been implemented, a child's pendency placement is "the operative placement under which the child is actually receiving instruction at the time the dispute arises"). The Second Circuit has not specifically addressed whether the operative placement factor is a last resort to be considered only

in a case where no prior IEP was ever implemented. At least two courts in this district, however, have determined a child's pendency based on the operative placement factor, even when a prior implemented IEP did exist. In *Angamarca v. New York City Department of Education*, the court found it unreasonable "to conclude that a placement described in an IEP issued five years ago" could establish "a placement . . . that is appropriate now," because that placement did not "reflect the status quo." No. 19-CV-2930 (PGG), 2019 WL 3034912, at *6 (S.D.N.Y. July 11, 2019). And in *Avaras v. Clarkstown Central School District*, the IEP most recently implemented was from the second grade, which the Court noted was "outdated and inapplicable" to the needs of the child, who was then in high school. No. 18-CV-6964 (NSR), 2018 WL 4080352, at *3 (S.D.N.Y. Aug. 27, 2018). The *Angamarca* and *Avaras* courts thus determined that the child's pendency placement was at the "operative placement" when their parents commenced suit against the school districts, rather than the placement established in the then outdated IEPs. *Id.*

Here, as in *Angamarca*, the 2014–2015 IEP, which Plaintiffs allege was implemented when L.S. was 5 years old and still in pre-school, cannot—consistent with the purposes of the stay-put provision—dictate the pendency placement for L.S., who is now 10-years-old. Although the IEP for the 2014–2015 school year in this case is not in the record, at the initial August 9, 2018 pendency hearing, the IHO discussed the contents of an IEP which the DOE stated was implemented "from September 4th of 2014 to June 30th of 2015." Aug. 9, 2018 Hr'g Tr. at 16:13-17. The DOE explained that this IEP provided for a 12:1:14 class size, with services of physical therapy, speech therapy, and occupational therapy, four times a week for 30 minutes, and vision education twice a week for 30 minutes. *Id.* at 15:5–10. Nonetheless, L.S. spent the next three years at iHope. While the record is not entirely clear on the services provided for each of those years, for the 2016–2017 school year, she was receiving services of physical, speech and language

therapy five times a week for 60 minutes, occupational therapy four times a week for 60 minutes, and vision education twice a week for 60 minutes. And the IEP authored by iHope dated April 20, 2018 indicates that L.S. had been taught in a 6:1:1 classroom the prior year. The program recommended by the 2014–2015 IEP, then, provides for most services at approximately 40–50% of the amount of time for which L.S. appears to have received those services for the three years thereafter, and in a larger classroom. Basing L.S.'s pendency off such a program clearly does not preserve the status quo—it disrupts it. Moreover, the DOE conceded at oral argument that a continued placement at iHope would be the most consistent placement for L.S., and it expressed no objection to continuing to fund L.S.'s placement at iHope—although it could not advocate for as much in light of the language of the settlement agreements. Thus, given how long ago the previously implemented IEP was created, determining pendency under the operative placement factor better aligns with the purposes of the stay-put provision. The Court therefore applies the operative placement factor in determining L.S.'s pendency.

Plaintiffs argue that iBrain is L.S.'s operative placement because she was enrolled there when the due process complaint was filed on July 9, 2018. While it is true that L.S. was enrolled at iBrain on that date, that was also L.S.'s *first day* attending the institution. The *Angamarca* plaintiffs had similarly moved their child to iBrain on the same day they filed their due process complaint with the DOE. The court held that, because the child had begun his education at iBrian on the same day, "there was no educational status quo to preserve" at the institute. *Angamarca*, 2019 WL 3034912, at *7 (concluding that iBrain "cannot reasonably be regarded as the 'current educational placement'"). Plaintiffs have failed to persuade the Court that the reasoning in *Angamarca* was in error. iBrain, accordingly, cannot be deemed to be the operative placement actually functioning at the time L.S. commenced her due process proceeding. Instead, the operative

placement functioning at the time Plaintiffs filed the 2018 due process complaint against the DOE was at iHope, where L.S. had been attending school for the prior three years, pursuant to the settlement agreements with the City. The SRO's pendency order is thus vacated and Plaintiffs' request that iBrain be deemed L.S.'s pendency placement is denied.

To be sure, in *Zvi D. by Shirley D. v. Ambach*, the Second Circuit held that the fact that the school district had agreed to pay for a child's placement for a single year, pursuant to a stipulation of settlement, did not render that school the child's pendency placement. 694 F.2d 904, 908 (2d Cir. 1982). Similarly, in *L.L. v. New York City Department of Education*, the court held that two settlement agreements in which the DOE agreed to pay for the child's tuition at a specific institution for the 2011–2012 and 2012–2013 school years, could not supersede an earlier March 2010 IEP for the purpose of pendency placement. In that case, those settlement agreements provided that they did not constitute a recommendation that the institution was an appropriate placement. No. 15-CV-4146 (JPO), 2016 WL 4535037, at *8 (S.D.N.Y. Aug. 30, 2016). But that does not necessitate the conclusion that iHope can never be L.S.'s pendency placement. Where, as here, the last agreed upon IEP cannot establish L.S.'s pendency, for the reasons discussed above, L.S.'s placement at iHope can constitute her pendency placement, notwithstanding that the settlement agreements provide no independent basis to make such a finding. *See Angamarca*, 2019 WL 3034912, at *6 (concluding that pendency was at iHope, even though parties had entered settlement agreements that precluded them from taking such a position in litigation, given that last implemented IEP was outdated and would disrupt the status quo). As the DOE noted at oral argument, the settlement agreements prevented the parties from asserting that iHope was L.S.'s pendency placement, but did not bar the Court from making such a determination. The Court thus concludes that L.S.'s pendency is at iHope. Otherwise, L.S. would have no pendency placement,

which is an "impossible result." *Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 325 (S.D.N.Y. 2005) (concluding that, because the district had recommended that the child not be placed at his last agreed-upon IEP, the child's pendency placement was at the school he attended pursuant to a one-year settlement agreement since there would otherwise be no pendency placement).

## CONCLUSION

Although the Court is sympathetic to Plaintiffs' desire to choose the specific school to place their child while their due process complaint is pending, the IDEA does not grant them that right. Therefore, for the foregoing reasons, Plaintiffs' motion for a preliminary injunction is DENIED. The Clerk of Court is directed to terminate the motion pending at Dkt. 19. The parties shall appear for a conference on November 15, 2019 at 10:30 a.m. SO ORDERED.

Dated:   October 29, 2019
         New York, New York

Ronnie Abrams
United States District Judge

18